**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CASE NO. 2:18-cr-22** |
| **VERSUS** | * | **JUDGE WOOD** |
| **ELIZABETH MCALISTER, ET AL** | * | **MAGISTRATE JUDGE CHEESBRO** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## DEFENDANT ELIZABETH MCALISTER RESPONSE TO THE COURT'S NOVEMBER 28, 2018, ORDER DIRECTING SUPPLEMENTAL BRIEFING

Elizabeth McAlister, defendant in this matter, submits supplemental briefing, as directed by the Court's Order dated November 28, 2018 (Dkt. No. 294), regarding the defendants' affirmative defense under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, as raised in their motions to dismiss. On November 7 and November 19, 2018, the defendants and the Government presented evidence and argument on the RFRA defense. The Court's Order directs the parties to limit their supplemental briefing "to identifying evidence submitted at the evidentiary hearing and explaining how that evidence relates to the RFRA arguments in Defendants' motions to dismiss." (Court's Order, page 1)

To avoid duplicative submissions, each defendant's supplemental brief contains two parts, in addition to the Summary. Part I addresses evidence and provides explanations common to all defendants, and it is adopted by reference by each defendant.[1] Part II addresses evidence and provides explanations specific to the particular defendant filing the brief.[2]

---

[1] Part I in its entirety appears identically in the Supplemental Briefing submitted on behalf of each defendant. Part II explains how Elizabeth McAlister's testimony corresponds to her RFRA defense.

[2] In analyzing her Religious Freedom Restoration Act defense, Ms. McAlister specifically incorporates her testimony at the initial appearance in this matter on May 17, 2018, her Affidavit filed in this matter on September 26, 2018, the testimony of Professor Jeanine Hill Fletcher, the testimony of Bishop Joseph Kopacz, the declaration filed in this matter by Bishop Thomas Gumbleton, and her own testimony at the hearing on November 19, 2018.

1

## SUMMARY

The evidence is compelling, as a matter of law, that the prima facie elements of the RFRA defense have been satisfied, and that the burden has shifted to the Government to produce evidence and prove that this criminal prosecution is justified under RFRA. The evidence also demonstrates, as a matter of law, that the Government has failed to prove that it has a compelling interest to prosecute any of these individual defendants, and that the Government has failed to prove that such prosecution is the least restrictive means of furthering any compelling governmental interests. Therefore, on this evidentiary record, the Court must grant the defendants' motions to dismiss the charges. If the Court decides not to rule on any of the prima facie factual issues as a matter of law, then the available evidence is clearly sufficient to create triable issues of fact for the jury. However, on the two factual issues for which the Government bears the burden of production and proof (marginal compelling interest and least restrictive means), the Government has failed to even produce sufficient evidence for the jury to find in the Government's favor.

The evidence of the defendants on the prima facie elements of the RFRA defense clearly shows that the teaching of the Catholic Church is that the possession of nuclear weapons is immoral, as well as the use of those weapons to threaten or cause death and destruction. Moreover, a Catholic whose conscience is formed by those teachings conducts an exercise of religion when she or he engages in prophetic action to raise the consciousness of society about the immorality of those weapons. The defendants sincerely hold these Catholic beliefs, and every action of theirs for which they have been criminally charged was not only a prophetic religious action, but also a symbolic and sacramental religious action. Given the depth with which each defendant has long

---

Additionally Ms. McAlister specifically claims and incorporates the testimony and affidavits and declarations of each and every one of the other six people facing these charges.

held these religious beliefs, imprisonment constitutes a substantial burden on her or his continued exercise of these religious beliefs.

Because the defendants have produced compelling evidence to prove their prima facie case under RFRA as a matter of law, that statute requires the Government to produce evidence and prove that, with respect to each defendant taken individually, the Government is undertaking only those actions that are the least restrictive of the defendants' exercise of religion, as a means of achieving some compelling governmental interest. The Government contends that one general interest in this case is the prevention of unauthorized entry onto the Kings Bay naval base, which entry disrupts normal base operations and risks injury to base personnel and possibly to those entering – a risk of injury not caused by any violent action by these nonviolent defendants, but possibly through accidental injury. The Government's only other claimed interest, based on the evidence, is a general interest in compensation for any injury to Government property that was caused by the defendants.

RFRA therefore requires the Government to assess, with respect to each defendant, whether the Government's general interests are so "compelling" that they justify the imposition of a substantial burden on religious exercise. RFRA also requires the Government to assess, with respect to each defendant for whom it does have a compelling interest, the range of means that would be effective in furthering those compelling interests. Then the Government is required to use that means that is least restrictive of a defendant's continued exercise of her or his religious beliefs. What the Government can never legitimately do is use the imprisonment of these defendants as a means to deter possible religious protests in the future.

However, the Government's evidence conclusively proves, as a matter of law, that it has met none of these RFRA requirements in this case. It has not produced sufficient evidence to prove

that its general interests are "compelling" as to any individual defendant. It has undertaken no assessment, for any individual defendant, of any effective but less restrictive means of achieving its interests, other than criminal prosecution. The only relevant evidence is the testimony of Captain Lepine that his policy is to ignore the religious nature of protests altogether, that he has no authority to implement alternatives to criminal prosecution, and that he regarded his only option to be turning the defendants over to the Camden County Sheriff's Department for prosecution. Indeed, the evidence shows that <u>no</u> decision process exists at Kings Bay for implementing RFRA in the case of religious protestors, that there is <u>no</u> policy for treating religious protestors any differently than terrorists are treated, and that these defendants were in fact treated the same as terrorists on the night of their arrests.

Finally, there is <u>no</u> evidence at all that, in the considerable time since the arrests of these defendants, anyone in the federal government has conducted an individualized assessment of less restrictive means. Indeed, there is positive evidence that Captain Lepine has the authority to issue "ban and bar" ("debarment") letters to the defendants, but that Captain Lepine did not even consider using this or any other less restrictive means. There is also positive evidence indicating that Captain Lepine has a policy of disregarding the religious nature of protests generally, which helps to prove that the Government has failed to address its RFRA responsibilities in this case.

While this Court has no authority to create or implement RFRA policies for the Executive Branch, it does have the obligation to conclude, on this evidence, that the Government has violated RFRA in bringing these criminal charges against these defendants. The Court must therefore dismiss these charges.

## I.   EVIDENCE AND EXPLANATIONS COMMON TO ALL DEFENDANTS

This part of the brief presents the evidence and explanations common to all defendants, insofar as that evidence relates to the actions of the defendants that are the basis for the criminal charges (hereinafter, "defendants' actions at Kings Bay"). This evidence was presented at the hearing on Nov. 7 by Professor Jeannine Hill Fletcher (PHF: 29/11–97/16), Bishop Joseph Kopacz (BK: 99/1–123/12), and Captain Brian Lepine (CL: 211/13–287/6); and at the hearing on Nov. 19 by Mr. Scott Bassett (SB: 177/17–198/19).

**A.**     **Evidence Relevant to the Prima Facie Elements of the RFRA Defense**

        **1.**     **Each action of the defendants at Kings Bay constituted an "exercise of religion."** The evidence clearly identifies the nature of all of the defendants' actions at Kings Bay as an exercise of religion, and clearly articulates the religious principles underlying those actions. Each action of the defendants at Kings Bay bore those characteristics that mark it as an exercise of religion that is in accordance with the beliefs, principles and practices of the Catholic Church. As Professor Hill Fletcher testified, the actions of which the defendants are accused – "trespassing onto military property, cutting a lock, cutting a fence, and spreading blood and paint on symbols of nuclear weapons" –  "are in accordance with Catholic practice and Catholic faith." (PHF: 40/21–41/3, emphasis added; also 39/8-9, 43/7-9) In addition, the testimonies of individual defendants, discussed in Part II of defendants' briefs, show that all of the defendants' actions at Kings Bay were motivated by those Catholic religious beliefs.

        a.     Each action was in accordance with the beliefs and principles espoused by the Catholic Church at its highest levels. "[T]he belief of the defendants that nuclear weapons are immoral is, in fact, the teaching of the [Catholic] Church" – "not just when [those weapons] have been used in the past," and "not just the threat of their being used now," but "the very possession of these weapons of mass destruction" is immoral. (PHF: 38/13–39/1; BK: 104/12-20) The bases

for this conclusion are the teachings of Pope John XXIII (in the encyclical *Pacem in Terris*), of the Second Vatican Council of Catholic bishops (in *Gaudium et Spes*), and of Pope Francis ("The threat of their use as well as their very possession is to be firmly condemned"). (PHF: 37/11–38/12; BK: 104/15-20)

      b.     Each action was a sacramental action in accordance with the Catholic tradition. In general, an action that is sacramental within the Catholic tradition is more than merely symbolic: it is "not just a symbol of Christ's grace but actually mak[es] it a reality in the world." (PHF: 94/7-23) The idea of sacramental action "within the Catholic tradition is that, in following Christ, those who follow him become … sacramental signs of Christ." (PHF: 41/14-17) "[T]he actions that we undertake in the world are not just … symbolic, but they actually make the presence of God's grace a reality in the world." (PHF: 41/17-20)

      In particular, "the actions that the defendants undertook [at Kings Bay], … [were] sacramental signs that are aimed at making holy what had been desecrated." (PHF: 41/21-23) "[I]n breaching that false security of those fences [at Kings Bay], … they entered the space to announce the message of Pope Francis." (PHF: 42/14-16) "[B]y entering that space, announcing that message, and reminding us that the call of the Catholic is to simply love one another …, those actions are in continuity with … a Catholic sacramental understanding of our job, our role as Catholics to be part of a world and to continue to make it God's holy creation." (PHF: 42/20-25; also 89/9–90/6)

      In addition, the defendants' actions at Kings Bay have "a pattern that is outlined within Catholic canon law, … [W]hen sacred places are violated by gravely injurious actions done in them, then … the Code of Canon Law 1211 has a penitential rite by which that sacred space is repaired." (PHF: 65/5-13) To be a sacramental action, it cannot be performed simply anywhere:

"the reality of what's in front of us [is] part of the sacramental moment" – "in terms of really being connected with the site of the desecrated location … then it has to be performed in that location." (PHF: 67/20–68/6) Also, the use of blood as a material "for making holy what has been desecrated, is a tradition that we can see within both the Old Testament and the New Testament." (PHF: 87/17-20)

      c.    <u>Each action was also a prophetic action in accordance with the Catholic tradition.</u>
In general, "prophetic action is designed to call a community or a nation back to justice and righteousness" (PHF: 93/9-19) "The role of the prophet is to look at the signs of the times, what's going on, and to call the community back to justice and righteousness." (PHF: 53/10-12) A sacramental action may simultaneously be a prophetic action, if it "authentically makes present Christ's grace in a situation of injustice," and "it is denouncing injustice and bringing about justice and righteousness." (PHF: 96/3-10) "In the history of the Catholic and the Christian tradition the prophetic role is one that often necessarily violates unjust laws in order to see those laws transformed." (PHF: 53/14-16)

      In particular, "the actions of the defendants [at Kings Bay] are in accordance with Catholic faith on the understanding of what prophetic action is and … their actions are in accordance with the Catholic faith on this." (PHF: 44/10-13; BK: 109/4-15, 116/6-21) "[T]he actions that the defendants undertook were actions that were attempting to reveal our own idolatry in protecting that warhead. They cut the fence to break that symbolic hold of Trident over those of us who are kind of just going along our day and not even aware that that idol is so clearly in place." (PHF: 42/8-13) "Their prophetic call in that action was at the heart of the Christian Gospel." (PHF: 46/17-22) "[T]he reality that the prophetic action reveals is a reality that some among us as human beings

have made the claim that we can decide the future of the planet. … [N]uclear weapons could destroy humanity as we know it, the earth as we know it." (PHF: 58/24–59/3)

Moreover, the location of the defendants' actions at Kings Bay is important to the prophetic action. "I would also underscore that the kind of complacency that our nation has adopted with respect to nuclear arms is contrary to what the Catholic Church is teaching, that is, that … the possession of nuclear arms is firmly condemned. So … this particular sacramental action was also directed at what the prophet does in terms of waking up the rest of society to the injustice that has become the status quo." (PHF: 72/7-15; also 83/7-24) And "the location is very important here in terms of a sacramental action that called a prophetic call to transform that particular reality of idolatry and to reclaim that particular location as part of God's creation and to transform that reality." (PHF: 81/21-25)

    d.   <u>Each action was also in accordance with the Catholic beliefs and principles about the moral primacy of an individual's conscience.</u> In accordance with the concept of prophetic action within the Catholic Church, it "is <u>enjoined on</u> Catholics that they, too, <u>must</u> read the signs of the times and interpret them in the light of the Gospel." (PHF: 46/9-12, emphasis added) "[T]he teaching of the Church is that conscience binds us to those human laws that are in accordance with the moral law, or the law of God written on our hearts, and that conscience is not binding on those laws that are determined to be unjust laws." (PHF: 35/2-6) "Laws and decrees passed in contravention of the moral order, and hence of the divine will, can have no binding force in conscience since it is right to be obey [sic] God rather than men." (PHF: 40/15-19, quoting Pope John XXIII's encyclical *Pacem in Terris*; BK: 108/19–109/3) Moreover, "it's not just doing wrong actions [for which we are responsible]; it's actually simply participating in a status quo that is unjust." (PHF: 60/5-12) "[E]very Christian, every Catholic is responsible for the justice or injustice

of the world that we live in and … Catholics are called to be part of the transformation of unjust structures." (PHF: 60/18-22; also BK: 121/11-24) Conscience can compel action in the sense that, given "an internal listening to the law of God that's written on human hearts," the action is "compelled by a deep spiritual, internal understanding of what one's conscience is bound to do." (PHF: 92/1-7; BK: 106/25–107/25)

In particular, "the actions of the defendants [at Kings Bay] are in accordance with Catholic social teaching on the primacy of conscience." (PHF: 34/18-20) And "the unjust law in this case is the proliferation of nuclear weapons that is not directed towards the global common good and that, from Catholic perspective, overreaches the power of any human lawmaker to have that sort of an arsenal that can destroy life on this planet." (PHF: 82/9-13)

2.      **The religious beliefs of the defendants are "sincerely held."** Part II of this supplemental brief presents persuasive evidence that this defendant sincerely holds these Catholic beliefs, and the defendant is not "seeking to perpetrate a fraud on the court.

3.      **The Government's bringing criminal charges imposes a "substantial burden" on the defendants' exercise of religion.** As the evidence discussed in Part II helps to show, the Government's bringing criminal charges for the defendants' actions at Kings Bay places considerable pressure on the defendants to violate their sincerely held religious beliefs. As the Government's evidence shows, this criminal prosecution is <u>intended</u> to place pressure on defendants not to exercise their sacramental religious actions: "failing to prosecute them would only reinforce that behavior" (CL: 230/11-13). But imprisonment places a substantial burden not only on sacramental religious actions involving unauthorized entry onto Government land, but it also places a substantial burden on future prophetic religious actions by the defendants that are permitted on public or private land. Imprisonment places a substantial burden on the defendants'

9

religious actions that protest the immoral possession of nuclear weapons. "If they're being restricted from acting, then that is, in effect, compelling them not to act." (PHF: 77/14-17)

**B.      Evidence Relevant to the Government's Asserted Justification under RFRA**

**1.      The Government's evidence is insufficient, as a matter of law, to establish a "compelling governmental interest" against any one of these individual defendants.** As the defendants have explained in their earlier supplemental briefs on the RFRA defense, the Government has the heavy burden of establishing, against each defendant as an individual, the Government's "marginal interest in enforcing" the statutes under which it has criminally charged that defendant. (Dkt. No. 245, pages 24–27.) First, the Government must clearly identify the legitimate interest that it seeks to achieve through criminal prosecution. Second, the government must prove, with respect to each individual defendant, that its "marginal interest" in not accommodating that individual defendant's nonviolent religious exercise is itself "compelling."

      a.      The Government claims a general interest in (1) preventing unauthorized entry onto the Kings Bay naval base and in (2) recovering compensation for injury to government property. First, according to the testimony of Captain Lepine, "there is absolutely a compelling interest to prevent unauthorized access to Naval Submarine Base Kings Bay" (CL: 226/15-16). The presence of such unauthorized personnel "may … endanger the safety of base personnel" (CL: 226/17-20), and "those intruders [are] endangering … their own safety" (CL: 228/13-18). Moreover, "it puts the entire security contingent on that installation on alert, which is disruptive to normal day-to-day operations associated with the operation of the base. Disruption of those operations has the ability to impact operations that are directly in support of our nation's strategic deterrence programs, timelines, and policies and procedures." (CL: 227/16–228/2) Second, there is testimony by Scott Bassett that a fence was cut on the base, that concertina wire was cut, that a padlock was cut, and

that the static missile display suffered some defacement – all of which required some repair. (SB: 197/15–198/16)

      b.    <u>The Government has presented insufficient evidence, however, that it has assessed the religious actions of individual defendants, and that its interests are so "compelling" as to justify not accommodating these particular religious exercises.</u> As the case law and this Court has made clear, "the inquiry under RFRA for the compelling interest has to be focused specifically on the individual defendants" (Nov. 7 transcript, 234/25–235/5). The Government in this case confirms this requirement: "there has to be an individual basis, particularly with the compelling interest that needs to be articulated as to each specific defendant" (Nov. 7 transcript, 240/17-19). The Government, however, has produced insufficient evidence to prove that, with regard to each individual defendant's particular religious exercise, it has an interest that is so compelling as to warrant not accommodating these individual defendants. Indeed, there is good evidence to suggest that an individualized assessment would have demonstrated that the Government's two general interests are <u>not</u> compelling as to at least <u>some</u> defendants.

      First, the Government's own evidence demonstrates that, in the context of the defendants' actions at Kings Bay, "at no time was anybody threatened," "there were no reported injuries," and "no military personnel or 'assets' were in danger" (statement of Scott Bassett to *The Washington Post*, reported on April 5, 2018, and reaffirmed by Scott Bassett, SB: 190/16-23, 191/5–192/4; also 179/3-16). Thus, the Government acknowledges that the defendants' religious exercises on April 4-5 were in fact nonviolent and posed no harm.

      Second, several of these defendants conducted their religious exercise on April 4-5 at the static missile display inside the base perimeter fence. (CL: 244/14–245/1; SB: 198/1-3) This missile display is such a popular destination for the general public and of such little military

importance that Scott Bassett, as public affairs officer, has the authority to take members of the general public on tours to see it, and does so probably two or three times per week. (SB: 189/22–190/15, 192/13-22) Given this fact, the Government owes a specific explanation for how "compelling" it is to keep any defendants away from this specific location.

Third, the Government's practice of merely turning all trespassers over to the Camden County Sheriff's Department, normally without further follow-up as to the fate of those trespassers, undermines the Government's claim that its interest is so "compelling." In the case of another trespasser who was turned over to the Sheriff in a prior incident, Captain Lepine testified that he did not know whether federal charges were brought against that trespasser (CL: 258/20–259/4), and Captain Lepine apparently did not even issue a debarment letter in that case (see CL: 286/4-20). Indeed, the evidence would support a finding that the Government has in fact singled out these defendants in bringing a federal criminal prosecution in their case – the very opposite of what RFRA requires. At the very least, the Government owes an explanation of how "compelling" its interests are in the case of these nonviolent religious protestors.

Fourth, the Government has produced no evidence proving that a decision to accommodate the religious exercises of these defendants will lead to an increase of similar religious actions in the future, by these defendants or by others. The unsupported generalizations of Captain Lepine in this regard are precisely the kind of "slippery-slope" argument that the Supreme Court has rejected as a matter of law. (See Dkt. No. 245, page 31, using the wording of Gonzales v. O Centro Espírita Beneficente Uniao do Vegetal, 546 U.S. 418, 436 (2006))

Finally, the Government's evidence not only shows that no individual weighing occurred of religious interests against governmental interests, it shows a policy of ignoring the religious nature of protests altogether. For example, when groups have requested permission to conduct

anti-nuclear protests at the Bancroft Memorial, located on the real property of the base but outside the perimeter fence, those requests have not been treated any differently, whether they have a religious purpose or not. (SB: 187/13-23, 183/7–184/21; also CL: 249/18–250/8) If a group were to request permission to conduct a religious exercise at the static missile display, located inside the perimeter fence, it would not receive permission, and the religious nature of the exercise would be considered irrelevant. (CL: 271/10-22) This shows a mistaken understanding of what RFRA requires, and generally undermines the Government's evidence about whether its interests are "compelling" when weighed against the individuals' religious interests.

**2.      The government's evidence is insufficient, as a matter of law, to establish that criminal enforcement is "the least restrictive means" with respect to any one of these individual defendants.** As the defendants have explained in their supplemental briefs on the RFRA defense, the government must produce evidence and prove, against each individual defendant, "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion" of that defendant (quoting Burwell v. Hobby Lobby Stores, Inc., 573 U.S. — , 134 S.Ct. 2751, 2780 (2014)). (Dkt. No. 245, pages 30–33) The defendants have proposed the following as means that are less restrictive than imprisonment: civil injunction against future trespass, and civil damages or community service for injury to property; "ban and bar" (or "debarment") letters issued by the base commander; a pretrial diversion agreement by federal prosecutors; and a policy and practice to permit religious exercises on the Kings Bay naval base under certain circumstances. The Government acknowledges that it "has the obligation to respond to the alternative proposals that are put forward by the defense" (Nov. 7 transcript, 236/6-10). Nevertheless, the Government has not presented any such particularized evidence in relation to even a single defendant.

The only evidence even remotely on point is Captain Lepine's general and unsupported speculation that "prosecution is the least restrictive means of securing the compelling interest of protecting the property, assets, personnel on Kings Bay submarine naval base" (CL: 286/21–287/2). In reaching this conclusion, Captain Lepine considered the religious motivations of the defendants to be an irrelevant factor. (See CL: 257/20–258/19, discussing the charge of conspiracy) Because the issue of whether one means is less effective than another necessarily involves considering the religious motivations of the defendants, the Court should assign no probative value to Captain Lepine's generalization.

Moreover, this opinion is unsupported by Captain Lepine's experience, because he has never tried to impose civil injunction or community service as a base commander at Kings Bay. (CL: 248/1-13) Indeed, Captain Lepine's speculation is inconsistent with his experience. He has personally signed about 20 bar and ban (debarment) letters, and "that act has been successful at preventing [the] return of individuals" to the base – indeed, none of those individuals has re-entered the base and needed to be prosecuted. (CL: 248/16–249/2; 265/18–266/19) Left unexplained is why such debarment letters, which are within the base commander's discretion and authority, and which have been so effective in Captain Lepine's experience, would not be equally effective at achieving the Government's interests against these religious defendants.

As another example of a less restrictive means, Captain Lepine (and even Scott Bassett) has the authority to permit tours to the static missile display within the base perimeter fence, where some of the defendants exercised their religious beliefs, and members of the general public are routinely and often authorized access to "tour" the display. (SB: 189/22–190/15, 198/1-3; also CL: 244/14–245/1) Yet Captain Lepine testified that "members of the general public are not authorized access inside the fence line in any capacity to exercise their religious rights." (CL: 270/11-13)

Because the Government has refused to consider permitting religious exercises to occur at the static missile display, it has no basis for arguing that such an accommodation would be ineffective at furthering its interests.

Captain Lepine's opinion is also speculative with respect to what means may or may not be effective with respect to these particular defendants. At the hearing, this Court ruled that Captain Lepine "is unable to testify or offer any speculation about what would or would not have deterred these defendants" in the past. (Nov. 7 transcript, 235/1-3; also 231/20–232/1) In order to give a non-speculative opinion about any specific defendant, Captain Lepine would have had to undertake an analysis based on "knowledge about each individual defendant." (see Nov. 7 transcript, 237:9-15) There is no evidence that Captain Lepine has undertaken such a defendant-specific analysis. Indeed, the evidence shows that Captain Lepine has not even "considered [any] less restrictive means short of prosecuting" these defendants. (CL: 229/8-10, emphasis added)

The most that Captain Lepine could offer at the hearing were generalizations about hypothetical categories of individuals (e.g., about individuals with prior records of formal charges or convictions for trespass), but such hypothetical opinions are insufficient to satisfy RFRA's "exceptionally demanding" least-restrictive-means standard (using the wording of Hobby Lobby, 134 S.Ct. at 2780). As the Government has acknowledged, in responding to each of the defendants' proposed alternative means, the Government must assess "the probability of those alternatives in achieving … those compelling interests" (Nov. 7 transcript, 236/11-15). That assessment surely requires taking into account the specific beliefs, motivations, intentions and circumstances of each individual defendant. Otherwise, RFRA's "exceptionally demanding" standard would be routinely defeated by generalized hypotheticals.

It is not helpful to the Government if the evidence shows that Captain Lepine himself, as base commander, has "no authority to implement" fines, injunctions, pretrial diversion, or community service. (See CL: 229/6-16, emphasis added; also 264/10–265/10) Nor is it helpful that Captain Lepine's "responsibility to deal with trespassers, terrorists, or any … other unknown individuals … would be to turn them over to the Camden County sheriff for, essentially, arrest and use … this process to file charges against them" (CL: 229/16-21). RFRA places its obligations on the federal government as a whole, not on any specific official. The Government has presented no evidence that any government decision maker has even considered any of the defendants' proposed alternatives to criminal prosecution.

It is an inescapable conclusion from the evidence, as a matter of law, that the Government has failed to investigate alternative means of furthering its compelling interests, and that it has failed to demonstrate to the Court, on the basis of evidence, that it has complied with its responsibilities under RFRA.

## PART II.  ELIZABETH MCALISTER SPECIFIC RFRA COMMENTS

Elizabeth McAlister is 79 years old.  She has been in jail since her arrest in this matter since April 4, 2018.  Ms. McAlister has three children and six grandchildren.[3]

Raising issues of religious freedom is nothing new for Ms. McAlister.  She tried to raise a defense of religious freedom in federal court over three decades ago after discussions with former Attorney General of the U.S. Ramsey Clark.[4]  "On March 14, 1984 I spoke about this to U.S. District Court Judge Howard Munson of the Northern District of New York in response to the US government's efforts to keep us from talking about freedom of religion and the idolatry of

---

[3] Transcript November 19, 2018, page 125.
[4] Transcript November 19, 2018, page 128.  See also Affidavit of Elizabeth McAlister, filed September 26, 2018, paragraph 33 and the book referred to there.

nuclear weapons.   We sought to speak to the jury about the state religion of nuclear weapons.  I spoke at length then about the idolatry of nuclear weapons and the religion of protecting those weapons and how that is contradictory to our belief in God.  My plea to the court was published as "ON FREEDOM OF RELIGION AND CONTEMPORARY IDOLATRY," in THE TIME'S DISCIPLINE: The Beatitudes and Nuclear Resistance, 132-145 (Fortkamp Press 1989) authored by myself and my husband Philip Berrigan."[5] (A copy of the argument on those pages, which was referenced by Ms. McAlister in her testimony is attached to this Memorandum as Exhibit A).

Ms. McAlister has been a Roman Catholic since birth.[6]  She became a Catholic sister of the Religious of the Sacred Heart of Mary after two years of college and remained for 8 years.[7]

Ms. McAlister married Philip Berrigan and together raised their three children in a faith and resistance community called Jonah House in Baltimore Maryland. Ms. McAlister has been an active peacemaker for decades, speaking, writing and acting against nuclear weapons for decades.[8]  Her actions in this case are based on her faith.  The Catholic church, its leaders and its teaching condemn the possession and use of nuclear weapons as immoral and illegal.[9]

Pope Francis condemned nuclear weapons on November 20, 2017.  For Ms. McAlister, Pope Francis' position made it clearer to me that I should be involved in the process of eliminating nuclear weapons.[10]

---

[5] Transcript November 19, 2018, page 128.  See also Affidavit of Elizabeth McAlister, filed September 26, 2018, paragraph 33 and the book referred to there.

[6] Transcript November 19, 2018, page 127.

[7] Affidavit of Elizabeth McAlister, filed September 26, 2018, paragraph 2 and 3.

[8] Transcript November 19, 2018, page 128.  See also Affidavit of Elizabeth McAlister, filed September 26, 2018, paragraph 3 and 5.

[9] See declaration of Bishop Gumbleton and testimony of Professor Hill Fletcher and Bishop Joseph Kopacz.

[10] Affidavit of Elizabeth McAlister, filed September 26, 2018, paragraph 9.

All her preparations for the actions at issue in this case were "seeded and steeped in prayer."[11]  All the actions taken which are the subject of this case were taken as an expression of her Catholic faith, as outlined by Professor Hill Fletcher and others.[12]

The monument to nuclear weapons set up on the base is a religious symbol which makes these weapons and object of worship.[13]  The shrine to nuclear weapons is a form of idolatry. Missiles which are more and more powerful, more and more destructive are lined up for admiration, even worship.[14]

Idolatry of nuclear weapons is a total contradiction of religious faith.  "It's putting -- putting these things before God, and, you know, pushes God to the back seat. We've got our ways, and these are the weapons. Now, we might invoke God in them, but we're really putting our trust in the weapons. We are not putting our trust in God."[15]

"Everything I did at Kings Bay was a result of my faith and my commitment to challenge the idols whose only purpose is to destroy human life on an unimaginable scale. I went to Kings' Bay to use my body to refuse to bow down to these idols. I went to try to bring attention to the idolatry that it is requiring of our nation and its people. 1 went in a spirit of prayer and repentance. I went in hope that this witness might invite other people to reflect on the obscenity and on the idolatry that it is before God.  believe in God, Creator, who made all things including human beings. I believe God created humans (me and you) with a special mission to care for creation – exercising stewardship within creation. I have come to believe (informed by prayer, study of the scriptures, learning about the lives of those deemed "saints" in the Church) that

---

[11] Transcript November 19, 2018, page 139.
[12] Transcript November 19, 2018, page 139.
[13] Transcript November 19, 2018, page 131.
[14] Transcript November 19, 2018, page 131-132.
[15] Transcript November 19, 2018, page 132.

stewardship means living gently, reverently upon the earth.  We come to King's Bay to answer the call of the prophet Isaiah (2:4) to 'beat swords into plowshares' by disarming the world's deadliest nuclear weapon, the Trident submarine."[16]

Why did her faith compel her to confront these weapons on Kings Bay instead of from across the street? "I think that's the kind of action we have done and continue to do repeatedly, and I'll continue to do that kind of action. But there are moments when I feel and have felt called to, you know, go close and to go right up front, go right up to it and say, no, no. These weapons should not exist, and they certainly should not be the objects of idolatry, and they are in this culture."[17]

"The government's decision to prosecute me for several felonies means I am facing a long time in prison for acting consistent with my beliefs. I am faced with the choice of either following my conscience and living a life consistent with my faith and beliefs and going to jail, or denying the faith and beliefs with which I have tried to live my whole life. Going to jail for my beliefs keeps me away from my loving children and grandchildren, but these nuclear weapons and the government which protects their massive destructive power, leave me no choice, I must follow my conscience and my faith."[18]

At the conclusion of her direct testimony on November 11, 2018, Elizabeth McAlister read a prayer from Psalm 46 she copied down to say to the court.  ""God is our refuge and our strength, an ever-present help in distress; thus, we do not fear, though the earth be shaken and the mountains quake to the depths of the sea, though the waters of the sea foam around the mountains and the mountains totter. Come, come and see the works of God, Who has done

---

[16] Affidavit of Elizabeth McAlister, filed September 26, 2018, paragraphs 42, 44, 45, 47, and 48.

[17] Transcript November 19, 2018, page 132.

[18] Affidavit of Elizabeth McAlister, filed September 26, 2018, paragraph 1.

fearsome deeds on earth, Who stops wars to the ends of the earth. Who stops wars to the ends of the earth, breaks down the bow, splinters the spear and burns the shields with fire. Be still and know that I am God. I am exalted among the nations, exalted on earth. The Lord of hosts with us. Our stronghold is the God of Jacob."[19]

It is in that spirit that this memorandum is offered.

Respectfully submitted,

*/s William P. Quigley*
William P. Quigley, *admitted pro hac vice*
Loyola University New Orleans
7214 St. Charles Avenue
New Orleans, LA 70118
Quigley77@gmail.com
504.710.3074

*/s/ Jason Clark*
-------------------------------
**JASON CLARK, P.C.**
GA Bar No. 127181
2225 Gloucester St.
Brunswick, GA 31520
jason@jasonclarkpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on this **16th** day of January 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel registered for electronic service.

*/s William P. Quigley*

William P. Quigley

---

[19] Transcript November 19, 2018, page 135.

20